**BERGER v. UNITED STATES.**

No. 14578.

United States Court of Appeals,
Eighth Circuit.

Dec. 30, 1952.

Charles S. Sigoloff, St. Louis, Mo. (J. E. Sigoloff, St. Louis, Mo., on the brief), for appellant.

John T. Grigsby, Attorney, Department of Justice, Washington, D. C. (Charles B. Murray, Asst. Atty. Gen., George L. Robertson, U. S. Atty., Marvin C. Hopper, Asst. U. S. Atty., St. Louis, Mo., Vincent A. Kleinfeld, Attorney, Department of Justice, and Paul M. Steffy, Attorney, Federal Security Agency, Washington, D. C., of counsel, on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

820

COLLET, Circuit Judge.

Defendant was charged in three counts with unlawfully causing to be introduced and delivered for introduction into interstate commerce a number of cases of pickles and pickle relish in jars, which were adulterated within the meaning of 21 U.S.C.A. § 342(a) (4) in that they had been prepared and packed under insanitary conditions whereby they may have become contaminated with filth. The three counts related to separate shipments, one made on May 3, 1951, and two on May 17, 1951. At the close of the Government's case the Government dismissed the third count of the information. Motion to dismiss Counts One and Two was made by defendant at the close of the Government's case on the grounds that the information did not state facts sufficient to constitute an offense and that the statute upon which the information was based is unconstitutional. A separate motion for judgment of acquittal was made upon the ground that the evidence was insufficient to sustain a conviction. These motions were overruled. The defendant offered no evidence. The case was submitted to a jury which returned a verdict of guilty on both counts. After the verdict, the motion for judgment of acquittal on the ground of the insufficiency of the evidence was renewed and again overruled. Judgment and sentence followed, from which this appeal is prosecuted. Only two questions are presented on this appeal. Defendant challenges (1) the constitutionality of the statute, and, (2) the sufficiency of the evidence.

Unconstitutionality of the statute [1] is asserted upon the ground that it is so indefinite, uncertain and obscure that it does not inform one accused thereunder of the nature and cause of the accusation in violation of the Sixth Amendment to the United States Constitution.[2]

The constitutional test of definiteness and certainty of the language used in a statute defining a criminal offense has been frequently stated. Reference to only a few of the cases will sufficiently demonstrate the rule.

In United States v. Brewer, 139 U.S. 278, 288, 11 S.Ct. 538, 541, 35 L.Ed. 190:

"Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid." Citing United States v. Sharp, Fed.Cas.No.16,264, Pet.C.C. 118.

In Connally v. General Const. Co., 269 U. S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, it is stated thus:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law;

1. "§ 331. Prohibited acts
"The following acts and the causing thereof are hereby prohibited:
"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."
"§ 333. Penalties—Violation of section 331
"(a) Any person who violates any of the provisions of section 331 shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; but if the violation is committed after a conviction of such person under this section has become final such person shall be subject to imprisonment for not more than three years, or a fine of not more than $10,-000, or both such imprisonment and fine."
"§ 342. Adulterated food
"A food shall be deemed to be adulterated—
"(a) * * * (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; * * *."
21 U.S.C.A.

2. "In all criminal prosecutions, the accused shall enjoy the right to * * * be informed of the nature and cause of the accusation; * * *."

and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. International Harvester Co. v. Kentucky, 234 U.S. 216, 221, 34 S.Ct. 853, 58 L.Ed. 1284; Collins v. Kentucky, 234 U.S. 634, 638, 34 S.Ct. 924, 58 L.Ed. 1510.

And in United States v. L. Cohen Grocery Co., 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L. Ed. 516:

"The * * * inquiry * * * is the certainty or uncertainty of the text in question, that is, whether the words * * * constituted a fixing by Congress of an ascertainable standard of guilt and are adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them."

In the late case of Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 707, 95 L.Ed. 886, the Chief Justice, speaking for the Court, said:

"The essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct. * * * This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law.

*    *    *    *    *    *

"We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. United States v. Wurzbach, 1930, 280 U.S. 396, 399, 50 S.Ct. 167, 168, 74 L.Ed. 508. Impossible standards of specificity are not required. United States v. Petrillo, 1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877. The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Connally v. General Construction Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322."

■ It should be noted that the statute in question is designed to prohibit the introduction or delivery for introduction into interstate commerce of food, etc., which is adulterated. In aid of that objective it defines an adulterated food as that which:—

"* * * has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, * * *."

It is clear that the congressional intent is to make it a criminal offense for a person to prepare, pack or hold food under such insanitary conditions that it may become contaminated. It is not necessary that it actually become contaminated. Stated in the language of Chief Justice Stone in Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 738, 65 S.Ct. 961, 967, 89 L.Ed. 1320, the statute is designed to prevent adulterations "in their incipiency" by condemning insanitary conditions which *may* result in contamination.

■ It is clear from an examination of United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658; Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653, and Corn Products Refining Co. v. Federal Trade Commission, supra, that the clause—" whereby it may have become contaminated"—is not to be construed to mean that criminality may be predicated upon proof of an insanitary condition which gives rise to a "mere possibility" of contamination. The condition condemned by the statute, which must be proved to support a conviction, is one which would with reasonable possibility result in contamination. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 46, 68 S.Ct. 822, 92 L.Ed. 1196. Such construction placed upon the words "which may render such articles injurious to health" resulted in the statute being impervious to attack on constitutional grounds. United States v. Lexington Mill & Elevator Co., supra. That is also true of the statute now under consideration.

■ In the light of the foregoing construction of the statute, does it convey a sufficiently definite warning of what conduct will constitute a crime? Its plain meaning is that no one shall prepare, pack or hold food, in this instance pickle relish, for introduction or delivery for introduction into interstate commerce under conditions which would with reasonable possibility result in the food becoming contaminated with filth.

It is contended that because the statute leaves open for determination the *degree* of insanitation which would possibly or probably result in contamination, it does not meet the test of definiteness. Or, as the argument was put in Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 781, 57 L.Ed. 1232, estimates of the degree of dirtiness and lack of sanitation which would probably or with reasonable possibility bring about the prohibited result might differ and a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. But the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. The criterion of criminality is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct. Nash v. United States, supra. As illustrated in the Nash case:—" 'An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it' by common experience in the circumstances known to the actor." The perpetrator of the act must be held responsible for estimating what the jury may determine was the probable result of his act. No constitutional infirmity results when a statute imposes that burden. Nash v. United States, supra.

The argument is advanced that the statute is void for indefiniteness and uncertainty because it contains no definition of "insanitary conditions" and without such a definition no intelligent person can tell in advance when a condition violates the statute. We do not agree. The terms "insanitary conditions" and "contaminated" are descriptive terms commonly used and understood. True, there are degrees of insanitary conditions, some worse than others. And there are degrees of contamination. But both define a condition. And as heretofore demonstrated, the fact that a statute contains in its definition an element of degree as to which estimates may differ does not result in unconstitutional indefiniteness or uncertainty. When the terms "insanitary conditions" and "contaminated" are read with the qualifying word "filth", all become possessed with a more definite meaning. Impossible standards of specificity are not required. Jordan v. De George, supra. It is difficult to think of a more apt way to say that one should not prepare food under conditions whereby it would probably be filthy. Any reasonably intelligent person should know what that means. The statute is not subject to this attack.

■ Defendant contends that the evidence was insufficient to sustain the verdict. Defendant, a partner in the business of making pickles at a plant in St. Louis, Missouri, was charged specifically with unlawfully causing to be introduced and delivered for introduction into interstate commerce, in the name of the partnership, for delivery to named consignees in Illinois, a number of jars containing food, to wit, sweet pickle relish, which was adulterated in that it had been prepared and packed under insanitary conditions whereby it may have become contaminated with filth. An inspection of defendant's plant was made by an inspector for the Food and Drug Administration on May 21, 22, and 23, 1951. On May 29, 1951, the three shipments involved in the three counts of the information were seized at the place of business of the consignees in Illinois and later analyzed by government analysts. There is no contention that the seized shipments were not made at defendant's plant and shipped therefrom on May 3, 1951, and May 17, 1951. There is no question from the evidence of the insanitary condition of the plant on the dates the inspections were made. Defendant's argument is based on the fact that no government witness saw the shipments in question prepared, canned in glass jars and shipped, and that the testimony relative to the conditions existing on May

21, 22, and 23, and the analysis of the contents of the shipment was insufficient to show beyond a reasonable doubt that the plant was in an insanitary condition on the dates of the shipments, May 3 and May 17.

The evidence shows the following facts. The plant is housed in a brick building 60 feet wide and 150 to 200 feet long from north to south. Pickle stock is brought into the plant by railroad car through a large door. The brick walls contain approximately 200 unscreened glass windows. The glass in 20 or 25 has been broken out. Pigeons fly in and out. Sometimes they are shot and killed inside the plant. The outside doors are unscreened. The relish-making area is located in the south end of the building. The plant was not operated continuously. Orders were made up as received. Canning operations were suspended at intervals between orders. At the time of the inspections on May 21 and 22 no pickles were being canned. The hopper of the pickle chopper was rusted and corroded, the shaft rusted and grease was running down the shaft onto the cutting blades of the chopper. The chopper was so constructed that the chopped pickle material fell from the chopper onto a wooden trough which conveyed it into a vat on a lower level. Pickle relish material remaining from the last operation was imbedded in cracks in the wooden trough. In the relish-making area was a wooden table covered with dust, stained material, and its supporting structure was encrusted with spider webbing. In that area were 16 uncovered barrels of pickles and one barrel of onions. Vinegar flies were flying over the uncovered barrels, spider webbing partially covered the openings of six barrels approximately full of pickles, a spider was in the webbing above one barrel, houseflies rested on pickles in another barrel, on each pickle floating on top of the solution in another barrel there were two or three vinegar flies, bird feathers floating in the solution in another barrel, moldy pickles in two barrels, and a spider climbing over the pickles in another. In addition to the barrels, large vats approximately six feet in diameter and five feet high were used in the making of defendant's product. In two of these vats were pickles not in solution. Those pickles were covered with a whitish and grayish mold approximately one-half inch thick. There was a railroad car in the plant at the time of the inspection on May 21. On the railroad car there were wooden vats and in the vats were pickles in solution. In this solution were particles of sticks, grass, muddy pickles, and particles which resembled insects. On the outside of the plant were a number of vats, one partially full of pickles, some entirely or partially filled with water. Sticks and other foreign material were in the water. Trash and pickles in various stages of decomposition were on the ground around these vats. At another location inside the plant were other larger wooden vats, eight to ten feet in diameter. In some of them were pickles in solution, some were empty, none were covered. Pickles were scattered around the vats, some in reasonably sound condition, others in various stages of decomposition. The pigeons heretofore referred to appear to have had access to a large part if not all of the area inside the plant. They were not trained pigeons and were not housebroken. The result of their habitation in the plant was what would reasonably be expected.

It is defendant's theory of the law that these conditions cannot be presumed to have existed when the seized shipments were canned and shipped. As to the time they were canned there was evidence permitting the inference that the canning took place about the time of the shipments. There is no dispute that the shipments involved in Counts One and Two were made on May 3 and May 17, 1951, respectively. The evidence describing the conditions on May 21, 22, and 23, in some particulars justified an inference that those conditions had existed for a considerable period of time. But there was additional and more direct evidence of what the conditions were in the plant at the time the shipments in question were canned and shipped. The analysis of the contents of the seized shipments showed that the jars contained, in addition to pickle relish, fragments of a fly skin, part of a fly's leg, a number of mites, part of a beetle wing, a moth scale, frag-

ments of feathers and fragments of rodent hair. The evidence was not insufficient to support the verdict.

The judgment is affirmed.