**DEAN RUBBER MANUFACTURING
COMPANY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 17855.

United States Court of Appeals
Eighth Circuit.

Feb. 8, 1966.

**162**

David Skeer, Kansas City, Mo., Judith Whittaker, Kansas City, Mo., Sheffrey, Ryder & Skeer, Kansas City, Mo., of counsel, for appellant.

Joseph Teasdale, Asst. U. S. Atty., Kansas City, Mo., Herbert J. Miller, Jr., Asst. Atty. Gen., Washington, D. C., F. Russell Millin, U. S. Atty., Kansas City, Mo., William W. Goodrich, Asst. Gen. Counsel, for Food and Drugs, and William R. Pendergast, Atty., U. S. Dept. of Health, Education and Welfare, Washington, D. C., on the brief, for appellee.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Dean Rubber Manufacturing Company, a partnership, was tried to a jury under a ten-count information charging separate violations of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 331(a).[1] Five counts charged the interstate shipment of "adulterated" prophylactics [2] and five counts charged the interstate shipment of "misbranded" prophylactics.[3]

Defendant was convicted on the adulteration counts but acquitted of misbranding. The prophylactics were labeled "An aid in the prevention of venereal disease," despite the fact that some were found to have holes.

The crimes charged were misdemeanors and upon the jury's verdict, the District Court entered judgment of conviction and assessed fines for each violation. We affirm.

Defendant first asserts that the representation, "An aid in prevention of venereal disease," is not a claim of "quality" within the meaning of subsection 351(c), as it is not an expression of

---

1. 21 U.S.C.A. § 331(a):
   "The following acts and the causing thereof are prohibited:
   "(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

2. 21 U.S.C.A. § 351(c):
   "A drug or device shall be deemed to be adulterated—

   "(c) If it is not subject to the provisions of subsection (b) of this section and its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess."

3. 21 U.S.C.A. § 352(a):
   "A drug or device shall be deemed to be misbranded—
   "(a) If its labeling is false or misleading in any particular."

measurable component parts. Instead, the clause is a therapeutic claim warranting only that the prophylactic has a tendency to prevent venereal disease. We consider this argument hypertechnical as it would unduly inhibit the meaning of "quality" as used in the statute. While "quality" is descriptive of the organic composition of a substance, expressed in definite quantitative units, it is also definitive of the character, nature and degree of excellence of an article. Such is the general understanding and the dictionary definition of the word. Even the bare name of the device, "prophylactic," connotes a guard against or prevention of disease. The failure of a leaking prophylactic to prevent disease is manifest and does not require our elaboration.

In United States v. 43½ Gross Rubber Prophylactics, 65 F.Supp. 534 (D.C.Minn. 1946), aff'd. sub nom. Gellman v. United States, 159 F.2d 881 (8th Cir. 1947), a condemnation proceeding under subsection 351(c), the devices contained holes and were labeled only "prophylactics." That Court said:

> "The government inspection has established that the devices tested were defective in the number indicated, and there can be no serious doubt that the strength and quality of these particular defective articles fell below that which they purported or were represented to possess." Id. at 535.

We have examined the cases cited by defendant and find them to be inapposite. We conclude that the interstate shipment of prophylactics, having holes and failing to meet Government specifications, violates subsection 331(a) by having a lower quality than that professed through written expression and inherent meaning.

Defendant next contends that subsection 351(c) applies solely to drugs and not to devices. It is argued that subsection (b) applies only to official compendium drugs, and that subsection (c) is limited to drugs not subject to subsection (b); thus devices are excluded from the purview of subsection (c). This is not the intent of Congress. It is most improbable that Congress would pass an adulteration statute whose first sentence embraces both drugs and devices, and then confine adulterated devices to those which are also misbranded. This runs contrary to the purpose of the Act and fails to eliminate those evils which it was designed to eliminate. Section 351 begins: "A drug or device shall be deemed to be adulterated—." Adulteration is then defined in four subsections. The only one applicable to misrepresented devices is subsection (c) which clearly applies to devices as well as to drugs not listed in the official compendium mentioned in subsection (b). If language specifically referring only to drugs and contaminated devices is eliminated from the statute, it would read "[any] drug or device shall be deemed to be adulterated * * * if its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess."

We have heretofore called attention to Gellman v. United States, supra, sustaining a condemnation of defective prophylactics pursuant to subsection 351(c). It is noteworthy that the provisions dealing solely with drugs preface such provisions by the phrase, "if it is a drug." See, for example, 21 U.S.C.A. § 351(a) (3); 21 U.S.C.A. § 351(b) and (d).

Defendant would bolster its interpretation by using the headnote between subsections (b) and (c) because it does not mention "device." This, however, is not a part of the official Act of Congress and is entitled to no consideration in interpreting congressional intent.

Additionally, defendant would invoke the 1962 amendment, 76 Stat. 780, to support its interpretation. However, the 1962 Act has no effect on subsection 351 (c), as it was adopted to strengthen subsection 351(a), and clearly does not apply to devices. Its passage lends no support to the theory that subsection 351(c) does not include the definition of adulterated devices.

The Supreme Court announces the purpose of the Act as the protection of pub-

lic health and admonishes that "[r]egard for [this purpose] should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

█ Nothing on the face of subsection 351(c) limits its application to drugs and we conclude that the subsection applies to devices as well as those drugs not subject to the provisions of subsection (b).

Defendant also assails the constitutionality of the Act as enforced by the Government. It is claimed that the Government charges as violative only shipments of defective devices in excess of an unannounced and changing tolerance, thereby introducing elements of uncertainty and vagueness which are inconsistent with constitutional due process and cause the Act to operate *ex post facto.*

Despite the statutory proscription against the interstate shipment of a single adulterated device, defendant and other manufacturers of prophylactics are given the benefit of an administrative tolerance. The industry manufactures billons of prophylactics each year, making it impractical, imprudent and injudicious for the Food and Drug Administration to prosecute for the shipment of a single defective prophylactic.

As a practical solution, the Administrator adopted a working tolerance of 1% and prosecutes an interstate shipper only if the shipment contains an excess of the allowed variance. The tolerance has changed from time to time since adoption of the Act in 1938. A 1% tolerance has been in effect since July 1, 1957.

The Act gives the Secretary the discretion to refrain from prosecuting a minor violation whenever he believes that the public interest will be adequately served by a suitable written notice or warning.[4] The procedure benefits defendant and other manufacturers as well as the Food and Drug Administration. The basic fallacy in defendant's argument is the fact that the statute makes unlawful the interstate shipment of *any* adulterated device.[5] There is no claim that the charges in the information are not sufficiently explicit to inform defendant of the precise nature and cause of the accusations against him. We have heretofore upheld the constitutionality of another provision of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 342 (a) (4)) alleged to be void for indefiniteness because it left open for determination the degree of insanitation which would possibly or probably result in contamination. We said in Berger v. United States, 200 F.2d 818, 822 (8th Cir. 1952):

"* * * [T]he fact that a statute contains in its definition an element of degree as to which estimates may differ does not result in unconstitutional indefiniteness or uncertainty."

In *Berger,* we relied on the Supreme Court opinion in Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed 1232 (1913), in which the late Mr. Justice Holmes stated:

"And thereupon it is said that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. * * * [T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the pen-

4. 21 U.S.C.A. § 336:
   "Nothing in this chapter shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunction proceedings, mi-

nor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning."

5. Note 1 supra.

alty of death." Id. at 376–377, 33 S. Ct. at 781.

In United States v. 449 Cases, etc., 212 F.2d 567, 572, 573, 45 A.L.R.2d 846 (2nd Cir. 1954), the Court accepted the Government's tolerance regarding a food product to the extent that violation of that tolerance was evidence of adulteration, and even suggested that shipments acceptable to the administrative agency would be condemned. See and compare United States v. 233 Tins, More or Less, etc., 175 F.Supp. 694 (W.D.Ark.1959); United States v. Hunter Pharmacy, Inc., 213 F.Supp. 323 (S.D.N.Y.1963); A. O. Andersen & Co. v. United States, 284 F. 542 (9th Cir. 1922).

The Supreme Court in the recent case of United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), held that statutes are not invalid as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. There, a defendant who sold below cost was in violation of the Robinson-Patman Act making it a crime to sell goods at "unreasonably low prices for purpose of destroying competition or eliminating a competitor." The Court, speaking through Mr. Justice Clark, said:

> "Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. (Citation omitted.) In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged. (Citation omitted.) In view of these principles we must conclude that if § 3 of the Robinson-Patman Act gave National Dairy * * * sufficient warning that selling below cost for the purpose of destroying competition is unlawful, the statute is constitutional as applied to them." Id. at 32, 33, 83 S.Ct. at 598.

■ There is no vagueness in a statute which prohibits the interstate ship-

ment of *any* defective device. The fact that the Administrator allows a tolerance before reporting a case for prosecution does not infect the statute with constitutional infirmities when no claim is made that defendant was not apprised by the information of the precise conduct with which he was charged as being violative of the law.

Defendant's suggestion that the statute and its accompanying tolerance operate *ex post facto* is so deficient in legal and factual support as to require but little comment. The statute which includes devices was enacted in 1938. The 1% tolerance allowance was adopted by the Government in 1957. The crimes for which defendant stands convicted were committed in 1962. The prophylactic industry was made aware of this tolerance shortly after 1957 by the Administration's seizures and resulting judgments. There is no evidence that defendant was unaware of the tolerance or the testing methods used by the Government. As the Act prohibits the interstate shipment of a single adulterated device, the allowance of any tolerance whatsoever might be termed a matter of "administrative grace."

■ In any event, neither the statute nor the method of enforcing it suggests a retrospective operation for conduct committed some five years later. The Act as applied in the instant case does not punish that which was innocent when done; nor does it add to that which was criminal. Neither does it increase the malignity of the crime nor narrow the rules of evidence so as to make the conviction more easy. Calder v. Bull, 3 U.S. (Dall.) 385 (386), 1 L.Ed. 648 (1798).

Next, defendant challenges the District Court's denial of its motion for acquittal. The basis of the contention is that the evidence failed to establish that the prophylactics contained holes when shipped in interstate commerce. It is asserted that the Government water test was arbitrary and irrelevant in that the test itself created holes in the prophylactics; and that the evidence was uncontradicted

that the devices when shipped were free of holes or defects.

The Government's water test has been in use for many years. Without elaborate detailed description, the test consists of filling each sample prophylactic with three hundred cc. of water and observing for leaks or breakage. Unless the test is completed within one minute after the water is introduced, the results are not considered. In such a test, if three defective prophylactics are found in the representative sample of two hundred eighty-eight prophylactics, the Government considers a violation of the Act has occurred.

Defendant maintains that because latex rubber contains water soluble chemicals, the Government test could have created holes in the prophylactics examined. This argument is greatly attenuated by the admissions of defendant that it had been using a water test for twenty years as a double check of its own electronic testing equipment. Additional admissions revealed that defendant had been derelict in its water testing by failing to test sufficient samples received from its Puerto Rican plant. Defendant intended to increase this water testing by eightfold.

Defendant relies heavily upon its latex expert, Mr. Harold Berger. Mr. Berger is the owner of a company that supplies latex rubber to manufacturers, including producers of rubber prophylactics. He testified that because of the water solubles in latex, he attached no significance to the Government test. However, he could not pinpoint the time necessary to dissolve the chemical solubles. This depended upon what solubles were used and although Mr. Berger had tested latex prophylactics with water, he had never measured the length of time necessary for water to cause ill effects. He did admit that the water test will display a hole in the prophylactic if one exists. Contrarily, Mr. Gordon Youngs, another

prophylactic manufacturer, testified that it would take "a long period of time—several minutes before water introduced into a latex prophylactic would leach out the water soluble materials."

Since there is record evidence that the results of the Government's tests are not considered if the test takes longer than one minute, it can be said that the defendant's expert testimony is subject to doubt as Mr. Berger admitted he did not know the time period necessary for water to create holes in the prophylactics. In fact, the argument completely loses its force absent a showing that the Government water tests were destructive of the water solubles in the latex within a minute or less.

Aside from this basic deficiency underlying defendant's expert testimony, there are other reasons why we as a reviewing court cannot overturn the jury's factual conclusion on this issue.

We have held that when a witness has an interest, the jury is not compelled to accept his testimony at face value. Investers Diversified Services, Inc. v. Commissioner, 325 F.2d 341, 351–352 (8th Cir. 1963); Seletos v. Commissioner, 254 F.2d 794, 797 (8th Cir. 1958). More important in the instant case, however, we find that there is abundant record evidence rebutting defendant's theory. During the course of the trial, the Government demonstrated its water test to the jury, using prophylatics purchased for that purpose. The demonstration made clear to the jury all of the details of the water test as well as the time consumed in the making of such test. Also in connection with the demonstration, one of the purchased prophylactics was filled with thirty-seven hundred cc. of water—more than eleven times the amount used in the official test—without deleterious effect.[6]

Dr. William Howell Masters, a Director of the Reproductive Biology Research Foundation, an obstetrician and gyne-

---

6. Mr. Berger testified that the prophylactics used in the courtroom test were manufactured by a company that made the bulk of its product from gum rubber. The test device, however, was not identified as either gum or latex.

cologist and a man who had done much research in endocrinology and made numerous contributions to medical literature, testified that a prophylactic containing holes would not be effective in the prevention of venereal diseases. This witness also testified that he was familiar with the Government water test and that it was an effective test, but he did not consider it "severely demanding enough."

Furthermore, a small hole was made in one of the prophylactics with a hypodermic needle and it was demonstrated that a hole of this minuteness did not reveal any leakage under the water test.

In the light of all the record evidence, including the jury's viewing of actual tests conducted in the courtroom, it would have been completely justified in rejecting the opinion of defendant's expert and the essential corroborative evidence even if it had been completely uncontradicted in its technical aspects. Alexander v. United States, 271 F.2d 140, 146 (8th Cir. 1959); United States v. City of Jacksonville, 257 F.2d 330, 335 (8th Cir. 1958); Burnett v. Central Nebraska Public Power & Irrigation Dist., 125 F.2d 836, 838 (8th Cir. 1942).

■ In a trial contest, it is always the function of the trier of facts to assess the weight and credibility of expert testimony. John Blue Co. v. Dempster Mill Mfg. Co., 275 F.2d 668, 673 (8th Cir. 1960); Gasifier Mfg. Co. v. General Motors Corp., 138 F.2d 197, 200 (8th Cir. 1943); Solomon v. Renstrom, 150 F.2d 805, 808 (8th Cir. 1945).

The District Court refused to permit the jury to consider a proffered defense based on the maxim *deminimis non curat lex*. The Court's refusal is assigned as error.

The number of prophylactics in each shipment ranged from thirty-six hundred to twenty-eight thousand, eight hundred. The Government inspectors selected from each shipment two hundred eighty-eight prophylactics as a representative sample. These samples were tested and at least three out of each two hundred eighty-eight were found to contain holes.[7]

■ Defendant asserts that only three defective prophylactics in each of the five shipments containing thousands is *de minimis*. This argument, based upon the number of prophylactics shipped, is patently misleading and incorrect. The significant number is not the number shipped, but the number tested, *i. e.*, two hundred eighty-eight per shipment. The testimony of an expert mathematician, which stands uncontradicted, is to the effect that the Government's sampling procedure was a standard and valid one used and relied upon by private industry as well as other governmental agencies; that the number of samples were representative of the shipment and that the defects found in the five shipments ranged from 1.04% to 2.54%.

The Food and Drug Administration allows a shipper of rubber prophylactics a total of 1% defectives. It does not submit a case for prosecution unless the defectives found in the sampling process exceed this tolerance. The tolerance thus allowed is in effect an application of the *de minimis* doctrine, although not labeled as such. We are without authority to exonerate a defendant convicted of violating the statute which plainly proscribes the shipment of *any* adulterated device in interstate commerce.

Defendant cites certain cases under the Food, Drug and Cosmetic Act where the maxim is recognized, but these cases are civil in nature, having to do in the main with condemnation for the shipment of filthy, adulterated or misbranded food products. There is a vast difference between tainted food products which may be adulterated without being injurious to health and a defective prophylactic which allows contact with contagious venereal diseases.

We will not belabor this issue, but a strong argument could be made that

---

7. Only one lot required an examination of all two hundred eighty-eight devices before three defects were found.

there is no place for the *de minimis* maxim in criminal cases. We do not reach that question here as the Congress has exclusively invested the Secretary with authority to make judgment and refrain from prosecutions for minor violations.

The procedure adopted by the Government is a fair one. The background history of the departmental practices since adoption of the 1938 Act indicates that the Department used more lenient standards and allowed higher tolerances at first until the industry could adjust to the requirements of the Act. Nowhere in the record is there proof or even claim that the 1% tolerance is burdensome or that defendant or any others have been misled by the rigidity of the Government tests or the industry's knowledge thereof. All shippers are inspected each year, and it was shown that in recent years some shippers have been completely free of defective prophylactics. We mention this merely because of defendant's many claims unsupported by record evidence.

Defendant's final contention is that the motion for acquittal should have been sustained because of the Government's asserted failure to produce evidence establishing that the defective prophylactics were taken from or representative of the shipments described in the information.

Specifically, defendant points out that it made other shipments to the dealers in close proximity of time to the tested shipments, and in some instances the dealers had depleted a portion of their inventories when the samples were selected by the Government inspector. Additionally, defendant calls attention to the fact that the devices were not segregated on the dealers' shelves and the proof established lot sizes different from those stated in the bill of particulars.

The Government made proof upon each count that a common carrier received the shipment from defendant, delivered it to the dealer consignee, who in turn receipted for the shipment. The Government inspector then collected samples from the dealer who furnished shipping records of the shipments from which the samples were collected. The invoices and bills of lading were introduced into evidence as was the dealer's statement that the samples were from a shipment received from defendant on or about the date alleged in the information. The Government could hardly have proven more.

Defendant's guilt or innocence could not be affected by the sale of some of the prophylactics prior to the Government's collection of the samples. Likewise, it would have no material effect if the lot size of the shipment differed from that stated in the bill of particulars.

There is no dispute that defendant made the shipments or that the defective devices were defendant's product. It is settled law that a variance between the charges and the proof is not prejudicial unless defendant was misled at the trial or unless the variance was capable of depriving defendant of protection against another prosecution for the same offense. Brilliant v. United States, 297 F.2d 385, 390 (8th Cir. 1962), cert. denied, 369 U.S. 871, 82 S.Ct. 1140, 8 L. Ed.2d 275 (1962). See also Fed.R.Crim. P. 52(a). Neither is a variance in the date as alleged in the charge fatal unless the proof reflects that the crime was not committed within the period of limitation. Alexander v. United States, supra.

As there is no serious doubt that the defective prophylactics were taken from shipments on or about the time alleged, we fail to see where any prejudice could result by reason of any of the contentions made by defendant. The jury had a right to rely on the dealers' statements and the other record evidence, all of which was abundantly sufficient to support the verdict. Defendant's arguments are more technical than substantial, and our careful review of the entire record convinces us that the judgment of conviction should be affirmed.

It is so ordered.