UNITED STATES of America, Plaintiff-Appellant,

v.

CERTIFIED GROCERS CO-OP, a corporation et al., Defendants-Appellees.

No. 76–1112.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1976.

Decided Dec. 28, 1976.

Edward E. Lawson, Jr., Atty., App. Section, U.S. Dept. of Justice, Washington, D.C., David C. Mebane, U.S. Atty., Madison, Wis., for plaintiff-appellant.

Bradway A. Liddle, Jr., Claude J. Covelli, Madison, Wis., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, TONE, Circuit Judge, and KUNZIG, Judge.*

TONE, Circuit Judge.

In this food-adulteration prosecution under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.,* the government appeals under 18 U.S.C. § 3731 from a judgment of acquittal entered after a bench trial. The defendants, relying upon that section's provision that "no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution," have moved to dismiss the appeal for lack of jurisdiction. The question of jurisdiction, under the standard set forth in *United States v. Jenkins,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), is intertwined with the merits. On the authority of that case we dismiss the appeal.

The defendants, Certified Grocers Co-Op and two of its principal officers, were charged in a two-count information with violating § 301(k) of the Federal Food, Drug and Cosmetic Act,[1] by permitting flour held in their warehouse to become adulterated and permitting it to become exposed to adulteration.[2] Each count

---

* The Honorable Robert L. Kunzig, Judge, United States Court of Claims, is sitting by designation.

1. 21 U.S.C. §§ 301, *et seq.,* ch. 675, 52 Stat. 1040 (1938). Section 301(k) of the Act, 21 U.S.C. § 331(k), prohibits, *inter alia,*

   "the doing of any . . . act with respect to, a food . . . if such act is done while such article is held for sale . . . after shipment in interstate commerce and results in such article being adulterated . . .."

2. The term "adulterated" is defined in § 402 of the Act, 21 U.S.C. § 342. In the District Court the government proceeded under two of the alternative definitions:

   "A food shall be deemed to be adulterated—(a) . . . (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or

charged both adulteration and exposure to adulteration of certain described flour, General Mills brand in Count I and Pillsbury brand in Count II. Pursuant to Rule 23(c), Fed.R.Crim.P., the District Court made special findings of fact accompanied by an opinion explaining its decision. The court found the following facts:

The individual defendants were responsible for the day-to-day operations of the co-operative, including the sanitary conditions at the warehouse. The flour which was the subject of the information was shipped in interstate commerce and arrived at the warehouse on September 6, 1972, in the case of the General Mills flour, and August 28 of that year in the case of the Pillsbury flour. There were at least 15 bales of Gold Medal flour, each containing 12 two-pound bags, and 4 bales of Pillsbury flour, each containing 18 two-pound bags, making an aggregate of 252 bags.

A Food and Drug Administration inspection on September 19 and 20, 1972, while these 252 bags were being held for sale in the warehouse, disclosed that at least eight of them contained holes gnawed by rodents. These holes were approximately evenly divided between the General Mills flour described in Count I and the Pillsbury flour described in Count II. Only two of the individual two-pound bags were actually sampled, one from each lot. The General Mills bag contained two rodent excreta pellets and one rodent hair; the Pillsbury bag contained 10 rodent excreta pellets. Near the bales and elsewhere in the warehouse were several hundred rodent excreta pellets and several rodent bait boxes, one of which showed "recent rodent activity." Two dead rodents were "lying about outside the packaged food." There were numerous rodent burrows in the ground near the outside of the warehouse walls.

On September 20, 1972, after FDA inspectors had discovered the conditions just described, defendants voluntarily destroyed the 252 bags of flour, acknowledging in a written statement signed in the presence of the inspectors, "This flour was destroyed because they [the bales and bags] were rodent chewed."

Notwithstanding the foregoing findings, the court acquitted the defendants. With respect to actual contamination (21 U.S.C. § 342(a)(3)), the judge concluded that the government had not proved when the rodent activity in the warehouse occurred or whether the two packages which actually contained excreta were breached and contaminated before or after they arrived at the warehouse. Because of this gap in the evidence, he was unable to conclude "beyond a reasonable doubt that any of these defendants were the persons whose acts resulted in the presence of the [filth] in either of the two specific packages." Alternatively, he held that some minimum level of contamination was permissible under the statute and that "the quantity of foreign substances present was insufficient to support a conviction." The government does not challenge the holding on actual contamination, although presumably it does not agree with the alternative ground of the holding.

With respect to the possibility of contamination (21 U.S.C. § 342(a)(4)), the judge found that the presence, while the flour was being held in the warehouse, of "the gnawed holes and the rodent pellets and hairs and the two dead rodents lying about the packaged food . . . was no doubt an 'insanitary condition,'" but that "there was no reason to suppose that any of these things could or would enter the packages." He "attach[ed] somewhat less importance" to the lack of evidence of when the rodent activity occurred than he had with respect to the (a)(3) issue, and said "it may be inferred that some significant portion of that activity" occurred while the flour was present. Yet it was "difficult to draw sensible inferences as to what portion of this rodent activity" occurred before the flour arrived at the warehouse, and it was "impossible to determine" how much, "if any," occurred while the flour was there or so

whereby it may have been rendered injurious to health . . . .."

On appeal, only (a)(4) is relied upon by the government.

soon before the government's inspection that there was no time to take remedial action. And, "if a significant portion" of the rodent activity occurred before the flour arrived, the later activity "may have been picayune."

Recognizing that the standard required for conviction under (a)(4), as interpreted in *United States v. H. B. Gregory Co.,* 502 F.2d 700, 704–705 (7th Cir.), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), is whether the insanitary conditions made it "reasonably possible" that the flour would become contaminated,[3] the judge stated that "one might conclude that insanitary conditions . . . made it reasonably possible that a mouse would enter [two packages of flour] . . . and deposit therein . . . rodent excreta pellets

and one rodent hair . . . .." Because of the "elusive" nature of the conviction standards, he then stated that "the ultimate question appears to be how the word 'contaminated' in § 342(a)(4) is to be construed, in conjunction with 'reasonably possible.'" He construed "contaminated," as he had the language of (a)(3), to permit the presence of contaminants within a "range of tolerance contemplated by the statute."[4] He concluded that the filth described in the findings, which he calculated were the product of "about seven full mouse-days, so to speak," and was contained in a 100,000-square-foot warehouse, was within that range of tolerance.

■■■ Despite our misgivings about the District Court's interpretation of the statute[5] and the acquittal itself, we conclude

---

**3.** The "reasonable possibility" test was formulated in *Berger v. United States,* 200 F.2d 818 (8th Cir. 1952), which in turn was based upon *United States v. Lexington Mill & Elevator Company,* 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914), decided under the 1906 Act, and a series of decisions interpreting the analogous language of §§ 2 and 3 of the Clayton Act. *Standard Fashion Company v. Magrane-Houston Co.,* 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922); *Corn Products Refining Co. v. FTC,* 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); *FTC v. Morton Salt Co.,* 334 U.S. 37, 46–47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). On the basis of those decisions, the *Berger* court held that the statute was not unconstitutionally vague, despite the fact that it left open for determination "the *degree* of insanitation which would possibly or probably result in contamination . . . .." 200 F.2d at 822 (emphasis in original).

**4.** Earlier in his opinion, the district judge had reasoned that in view of the difficulty of maintaining a food warehouse free of all rodent activity, Congress must have intended to permit such a range of tolerance.

**5.** The 1938 Act was adopted to "strengthen and expand [the 1906 Act's] protection of the consumer . . . .." Sen.Rep. No. 152, 75th Cong., 1st Sess. at 1 (1937). *Cf.* Sen.Rep. No. 361, 74th Cong., 1st Sess. (1935). One of the specific purposes of the Act was to "compel the observance of reasonable standards of cleanliness in the preparation and handling of food products." Hearings on H.R. 6906, H.R. 8805, H.R. 8941, and S. 5 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, to Regulate Foods, Drugs, and Cosmetics, 74th Cong., 1st Sess. 96 (1935)

(testimony of Walter G. Campbell, Chief, Food and Drug Administration).

As Judge Maris noted in *United States v. 133 Cases of Tomato Paste,* 22 F.Supp. 515, 516 (E.D.Pa.1938), § 402(a)(3) of the Act, 21 U.S.C. § 342(a)(3), "was designed to protect the aesthetic tastes and sensibilities of the consuming public . . . .." Similarly, (a)(4) "almost reaches the aim of removing from commerce those products produced under circumstances which would offend a consumer's basic sense of sanitation . . . .." *United States v. 1,200 Cases-Pasteurized Whole Eggs,* 339 F.Supp. 131, 141 (N.D.Ga.1972). In interpreting the food and drug legislation, we should bear in mind the admonition of Mr. Justice Frankfurter in *United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943):

"The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words."

The Act does not provide for the setting of tolerances under (a)(4) as it does with respect to poisonous or deleterious substances under (a)(1) and (2), and 21 U.S.C. §§ 346 and 346(a). The Secretary is vested, however, with the discretion not to prosecute, or even not to institute libel or injunctive proceedings against, "minor violations" of the statute. 21 U.S.C. § 336. Although we would prefer that this broad discretion be regulated by administratively promulgated standards governing industry practices, "there would seem no authority for us to waive statutory violation perhaps be-

that we are required to dismiss the appeal for want of jurisdiction. The double-jeopardy clause governs our appellate jurisdiction under 18 U.S.C. § 3731. In *United States v. Jenkins, supra,* 420 U.S. at 367, 95 S.Ct. 1006, that clause was interpreted to permit an appeal from an acquittal following a bench trial if the district court's findings of fact show that it "resolved against the defendant[s] all of the factual issues necessary to support a finding of guilt under the correct legal standard." In considering whether there is jurisdiction over the appeal the trial court's findings can be sifted "to determine [whether] the court's finding of 'not guilty' is attributable to an erroneous conception of the law . . .." The double-jeopardy clause precludes review, however, if

> "further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would [be] required upon reversal and remand . . .. To subject [the defendants] to any further such proceedings at this stage would violate the Double Jeopardy Clause . . .." *Id.* at 370, 95 S.Ct. at 1013.[6]

We are unable to conclude that this rigorous standard is satisfied in the case at bar. Assuming, as we do, the correctness of the

government's interpretation of (a)(4), see note 5, *supra,* the district judge did not "expressly or even impliedly" find against the defendants "on all issues necessary to establish guilt." *United States v. Jenkins, supra,* 420 U.S. at 367, 95 S.Ct. at 1012. Specifically, he did not find that the conditions at defendants' warehouse made it "reasonably possible," *United States v. H. B. Gregory Co., supra,* 502 F.2d at 704–705, that the flour named in the information would be contaminated. Rather, he merely stated that "one might conclude" that some contamination was reasonably possible, and did so only after "assuming inspections and cleanup at reasonably short intervals," a fact as to which there was no evidence introduced at the trial. This is hardly the sort of finding necessary to establish guilt in a criminal case, in which the due process clause requires that guilt be proved beyond a reasonable doubt. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

■■■ Nor may we make the finding ourselves. Reasonable possibility was treated as an issue of fact in *United States v. H. B. Gregory Co., supra,* 502 F.2d at 705,[7] and we think it must be so viewed here. Although the finding of the District

yond the principle of *de minimis* . . .." *United States v. 449 Cases, Containing Tomato Paste,* 212 F.2d 567, 575 (2d Cir. 1954). *Cf. United States v. 1,500 Cases More Or Less, Tomato Paste,* 236 F.2d 208, 212 (7th Cir. 1956). See also Judge Frank's dissent in *United States v. 449 Cases, Containing Tomato Paste,* 212 F.2d 567, 575–581 (2d Cir. 1954). Thus, subsections (a)(3) and (4) do not appear to incorporate a "tolerance," permitting some minimal level of filth contamination in food. See also *United States v. 484 Bags, More or Less,* 423 F.2d 839 (5th Cir. 1970), and *United States v. 900 Cases, etc., Peaches,* 390 F.Supp. 1006 (E.D.N.Y.1975). In this regard we note that it would be small consolation to the consumers who ultimately received the two-pound bags of flour containing rodent excreta that the 179 other General Mills bags, or the 71 other Pillsbury bags, did not contain excreta.

**6.** Several cases from other circuits intimate that a verdict of acquittal by the trier of fact may bar appellate review. Compare *United States ex rel. Rogers v. LaVallee,* 517 F.2d 1330

(2d Cir. 1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976), and *United States v. Patrick,* 532 F.2d 142 (9th Cir. 1976), with *United States v. Kehoe,* 516 F.2d 78 (5th Cir. 1975), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 313 (1976), and *United States v. Martin Linen Supply Co.,* 534 F.2d 585 (5th Cir.), *cert. granted,* —— U.S. ——, 97 S.Ct. 308, 50 L.Ed.2d 282 (1976); *cf. United States v. Fayer,* 523 F.2d 661 (2d Cir. 1975); *United States v. Morrison,* —— U.S. ——, 97 S.Ct. 24, 50 L.Ed.2d 1 (1976). We do not read *Jenkins* so narrowly, however, in view of the Court's emphasis on the district court's failure "even impliedly" to resolve all the factual issues against the defendant or to make a finding of guilty "in form *or substance.*" 420 U.S. at 367–368, 95 S.Ct. 1006. (Emphasis supplied.) In *Jenkins,* of course, the Court decided it lacked jurisdiction over the appeal.

**7.** *Cf.* also *United States v. 1,500 Cases More Or Less, Tomato Paste,* 236 F.2d 208, 212–213 (7th Cir. 1956).

Court that at least eight of the 252 bags were rodent-chewed and two contained rodent excreta establishes actual contamination within (a)(3), *cf. United States v. H. B. Gregory Co., supra,* 502 F.2d at 703, and *a fortiori* a "reasonable possibility" of contamination, the court's inability to conclude beyond a reasonable doubt that this contamination resulted from any acts of the defendants precludes a determination that § 301(k) was violated. Receiving and holding the food after it has become contaminated does not satisfy the statutory words, "the doing of any act . . . with respect to, a food . . . [which] results in such article being adulterated." Furthermore, even if there might be circumstances in which the proximity of food to filth outside the food packages would establish a reasonable possibility of contamination as a matter of law, this is not such a case, because we cannot determine from the findings the proximity of the flour bags to that filth. However clear it may appear to us that the inference of a reasonable possibility of contamination should have been drawn, that inference could only be drawn by the trier of fact. It is too late for that under the Supreme Court's interpretation of the double-jeopardy clause in *Jenkins.* Thus, we cannot remand to permit the District Court to redetermine the facts under the correct legal standard.

APPEAL DISMISSED.