**UNITED STATES of America,
Plaintiff,**

v.

**An article of food consisting of 900 CASES, more or less, each containing 12 cans, labeled in part:**

(can)

**"___ Connoisseur Fancy Freestone Halves White Nectar PEACHES in ___ Heavy Syrup Net Wt. 30 Oz. (1 Lb. 14 Oz.) Packed for Jules Weber, Inc., Brooklyn, N. Y. 11206 8–10 Count"**

(case)

**"___ Connoisseur Nectar Fancy Halves ___ Louis Ender, Inc. Brooklyn, N. Y. ___", Defendant.**

**No. 71–C–1342.**

United States District Court,
E. D. New York.

Jan. 31, 1975.

David G. Trager, U. S. Atty., E.D.N. Y., for plaintiff; George H. Weller, Asst. U. S. Atty., Allan Bennett, Barbara Spivak, Attys., Food & Drug Administration, of counsel.

George Noroian, individually and as agent of Fruitful Valley Sun, claimants, pro se.

BARTELS, District Judge.

On July 22, 1971 the claimant, Fruitful Valley Sun, a California corporation, sold and subsequently shipped 900 cases of canned peaches, each containing twelve cans of peaches, to Louis Ender, Inc., in New York. On August 23, 1971, the peaches having arrived in New York, ninety-six of the cans were appropriated as a sample, of which thirty-five were inspected for test purposes by the United States Food and Drug Administration ("FDA"). After laboratory analysis the FDA concluded that the peaches were contaminated and thereupon placed them under embargo in the warehouse of Louis Ender, Inc. in Brooklyn, New York. The plaintiff, United States of America, now brings this libel in rem under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., for the condemnation of the 900 cases of peaches. Jurisdiction is based on 21 U.S.C. § 334(a)(1).

## FACTS

At the trial evidence was offered to show that three tests were made on the peaches, two by the United States and one by the claimant. The first test was made on behalf of the United States, on August 30, 1971, by Thomas Schwarz,

an entomologist for the FDA, who examined thirty-five of the ninety-six cans appropriated by the FDA as samples. He tested each of the thirty-five cans by first draining the contents of the can through a sieve and by rinsing the peach halves with distilled water, and he then filtered the drained juice and rinse water through filter paper thereby collecting on the paper all solid particles. As the next step he microscopically examined the residue for insect larvae and insect excreta and tabulated and recorded the results according to the manufacturer's can code numbers stamped on each can. In the ten cans with the code number NP718682 Schwarz found that five of them contained a whole moth larva and that nine of them contained insect excreta pellets with a range of three to thirty-seven pellets and an average of 11.9 pellets per can. He found a whole moth larva in eleven of the twenty-five cans stamped with the number NP72GN22, and in four of the cans he found two larvae. In addition he found in twenty-two of the twenty-five cans insect excreta with a range of one to sixty-seven pellets and an average of 18.9 pellets per can. The libel stems from this information.

On March 30, 1972 the Commissioner of Food and Drugs published for the first time in 21 C.F.R. § 128.10 a notice announcing that the FDA had established maximum acceptable tolerance levels for natural and unavoidable defects in food not hazardous to health, copies of which levels were obtainable upon request. Until then these unpublished tolerance levels were employed for the purpose of enabling the FDA to determine whether or not to file a libel and have served the same purpose since publication. For canned peaches the defect tolerance level is "Average 5% wormy or moldy fruit by count or 4% if a whole larva is found in 20% of the cans." Some time prior to November, 1972, the claimant requested and received a copy of the defect tolerance levels referred to above.

In November, 1972 the claimant requested, for testing purposes, a duplicate set of sample cans of peaches and, accordingly, the FDA on January 8, 1973, shipped to the claimant thirty of the ninety-six sample cans. On July 5, 1973, at the request of the claimant, Dr. York, a biochemist engaged in extension food technology at the University of California at Davis, tested each of the thirty cans of peaches in the following manner. He first tested each can separately by filtering the juice through filter paper under vacuum and microscopically examining the remaining fragments for insect fragments and insect larvae. He then washed each peach half with distilled water, added back the water to the peaches, and macerated the entire mixture in a mechanical blender. After this procedure he put the blended mixture into a flask and, in order to isolate all animal parts, he then, pursuant to the "Wildman Trap Flask Method," added a light mineral oil which coated all such animal parts causing them to float to the top. Finally he decanted the mineral oil, filtered it through filter paper, and microscopically examined the remaining fragments. From this method Dr. York was able to count every insect fragment and he found through his tabulations that there were a total of ten insect fragments in eight of the cans tested. No examination of the individual peach halves for worminess or moldiness was made prior to their maceration although both claimant and Dr. York had copies, at the time, of the FDA tolerance levels for natural and unavoidable defects.

Because Schwarz's August 30, 1971 test on the thirty-five cans of peaches did not include an examination of the peach halves for worminess, as required by the published defect tolerance levels, he was instructed to test fifteen additional cans. On February 4, 1974 he individually tested each of the fifteen cans by draining the juice through a sieve, washing the peach halves with distilled water, placing the juice and rinse water in a flask, and, following the "Wildman

Trap Flask Method," adding heptane to the flask which coated all animal parts and caused them to float to the top. He then drained off the heptane, passed it through a filter paper, and microscopically examined the remaining particles for insect larvae. This examination revealed that six of the fifteen cans (40%) contained a total of nine whole insect larvae or their equivalent but Schwarz did not tabulate every insect fragment but rather only complete heads whether or not attached to a body. Schwarz also microscopically examined each peach half for evidence of the past presence of an insect either on or in the peach halves such as tunnelling, embedded insect fragments, and insect excreta. Thirteen of the one hundred and forty-three halves (9%) were found to have such evidence.

On May 1, 1974 the claimant, in order to retest the peaches in conformity with the published defect tolerance levels as interpreted by the FDA, requested a second set of sample cans which was denied. Because of this denial claimant moved, at the trial, to dismiss the libel which was also denied on the ground that there was no statutory authority requiring the delivery of two sets of sample cans to the claimant and for the further reason that the claimant was not misled since at the time of its first test it had in its possession the defect tolerance levels.

## DISCUSSION

Under 21 U.S.C. § 334(a)(1) the United States has the right to condemn any article of food, including peaches, which is adulterated and is shipped in interstate commerce.[1] Section 342(a)(3) of Title 21 defines "adulterated" as:

"A food shall be deemed to be adulterated—(a) . . . (3) if it con-sists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food."

At the trial it was established by a preponderance of the evidence that the peaches in question did contain matter constituting "filth" as that term is used in the statute. The results of the two tests performed by Schwarz and the one performed by Dr. York all reveal that the cans of peaches are contaminated by varying amounts of insect larvae and insect fragments. Since it has been long established, and the parties agree, that insects, insect larvae, and insect fragments are "filth" within the meaning of 21 U.S.C. § 342(a)(3), United States v. Cassaro, Inc., 443 F.2d 153 (1st Cir. 1971); United States v. 1,500 Cases More or Less, Tomato Paste, 236 F.2d 208 (7th Cir. 1956); Golden Grain Macaroni Co. v. United States, 209 F.2d 166 (9th Cir. 1953); United States v. Capital City Foods, Inc., 345 F.Supp. 277 (D.N.D.1972); United States v. 133 Cases of Tomato Paste, 22 F.Supp. 515 (E.D.Pa.1938), the only remaining questions raised by the claimant are: (1) the correctness and adequacy of the testing methods used by Schwarz, and (2) the amount of "filth", in the form of insect larvae and insect fragments required for a violation of 21 U.S.C. § 342(a)(3).

■ At the trial the claimant attacked the tests employed by the United States in determining the existence of "filth" as that term is used in 21 U.S.C. § 342(a)(3). The parties agree that the entire sample of ninety-six cans taken by the FDA from the nine hundred cases of canned peaches were selected at random and were fairly and reasonably representative of the defendant peaches. There was no evidence that the form of

1. Section 334(a)(1) of Title 21 provides:
"Any article of food, drug, device, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of section 344 or 355 of this title, be introduced into interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States or United States court of a Territory within the jurisdiction of which the article is found."

testing or the methods used were either improper or incorrectly performed by Schwarz who was a qualified expert with much experience in examining food for insect contamination. The claimant claims that Schwarz's second test on the canned peaches was not in conformity with a proper interpretation of the published defect tolerance levels for canned peaches which provide for:

"Average 5% wormy or moldy fruit by count or 4% if a whole larva is found in 20% of the cans."

The FDA has interpreted this phraseology to mean, and we agree, that the defect tolerance level is violated by an average of 5% wormy or moldy fruit by count and if a whole larva is found in 20% of the cans then it is violated if 4% wormy or moldy by count. The claimant contends that the tolerance level is violated only when the total number of insect larvae in the entire sample equals 5% of the total number of individual peach halves in the entire sample, and, if a whole larva is found in 20% of the cans, it is violated if the total number of insect larvae equals 4% of the total number of peach halves. The flaw in this contention is that it fails to observe the wording of the tolerance level in that it does not take into account or measure the peach halves for worminess or moldiness.[2]

■ We cannot accept the test of Dr. York as compared to the second test of Schwarz because the former failed to take into account or measure the peach halves for worminess while the latter did so. *The Webster's Third New International Dictionary* defines "worm" to mean an "insect larva" and the term "wormy" to mean "attacked or burrowed by worms." Schwarz measured worminess in the individual peach halves by evidence of the visitation to the fruit by insect larvae such as tunnelling, embedded fragments, and excreta which appro-

priately indicated the extent to which, if any, a particular piece of fruit was attacked or burrowed by insect larvae. Therefore, we find that all of the testing methods were proper and adequately designed to yield results consistent with a proper interpretation of the FDA defect tolerance levels for canned peaches.

Under 21 U.S.C.A. § 342(a)(3) an article of food may be condemned as filthy or putrid though not unfit for food, United States v. 484 Bags, More or Less, 423 F.2d 839 (5th Cir. 1970); United States v. 449 Cases, Containing Tomato Paste, 212 F.2d 567 (2d Cir. 1954), or may be condemned as unfit for food even though not filthy or putrid, United States v. 484 Bags, More or Less, *supra*; United States v. 24 Cases, More or Less, 87 F.Supp. 826 (D.Me.1949). Apparently the majority rule is "that the Act confers the power to exclude from commerce all food products which contain in any degree filthy, putrid or decomposed substances." United States v. 484 Bags, More or Less, *supra*, and cases cited therein. On the other hand, if the first phrase of § 342(a)(3), providing for the condemnation of food "if it consists in whole or in part of any filthy, putrid, or decomposed substance," is strictly enforced it would set a standard which "would ban all processed food from interstate commerce. A scientist with a microscope could find filthy, putrid, and decomposed substances in almost any canned food we eat. (The substances which it is claimed render the respondent 'adulterated' were visible only through a microscope.)" United States v. 1,500 Cases, More or Less, 236 F.2d 208, 210–211 (7th Cir. 1956). Such unjustifiably harsh consequences have been tempered or alleviated by the discretion given by Congress to the Secretary of Health, Education, and Welfare to make regulations establishing certain tolerances and granting certain exemptions, 21 U.S.C. § 346. However this provision

2. In passing it should be noted that Schwarz's results showed that a total of nine whole insect larvae were found in all fifteen cans which contained a total of 143 peach halves. Calculated according to the claimant's interpretation this would be a percentage of 6.3% which still exceeds both tolerance levels set forth in the regulation.

has no applicability to filthy, putrid or decomposed substances. But, there is relief for minor violations of filthy, putrid or decomposed substances in 21 U.S.C. § 336 where the Secretary shall not be required "to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning." See United States v. 449 Cases, Containing Tomato Paste, *supra.* Thus, to avoid the undesirable result of strict enforcement, the Act has been interpreted to exempt some contamination which may be inevitable and which is *de minimis.* Developments in the Law, The Federal Food, Drug, and Cosmetic Act, 67 Harv.L.Rev. 631,645 (1954). While the FDA defect tolerance levels for canned peaches might justify the Secretary under 21 U.S.C. § 336 in withholding prosecution, we do not believe that these guidelines represent a standard of *de minimis* contamination but, on the contrary, a much greater degree of contamination justifying prosecution.

■ In the absence of any authority to escape the statutory language concerning adulteration, the court must search for a *de minimis* standard and in doing so is compelled to rely, in the absence of any fixed standard, upon the expertise of the Secretary, whose guidelines we believe represent a proper and reasonable defect tolerance level for canned peaches. Since the results of Schwarz's second test reveal the existence of more than double the amount of "filth" deemed by the FDA to be natural and unavoidable, we conclude that more than a *de minimis* amount of "filth" was present in the canned peaches and that they were "adulterated" within the meaning of 21 U.S.C. § 342(a)(3).

■ We cannot close without a comment on the claim that the FDA guidelines were not published until after the peaches were canned and consequently the producer was compelled to can such peaches without such guidelines and, accordingly, that the peaches were condemned without due process. Judge Godbold, in United States v. 484 Bags, More or Less, *supra,* expressed a similar thought when he said that such a complaint was "not without equity," *Id.* at 842, and Judge Frank, in a dissenting opinion in United States v. 449 Cases, Containing Tomato Paste, *supra,* also stated that the determination of a standard by the Administrator should be published in the Federal Register in order to apprise the public and to discourage uncontrolled discretion by the Administrator. The absence of notice to the producer, however, would under no circumstances justify the distribution to the public of contaminated or adulterated food particularly since no evidence has been offered to show that such notice might have been instrumental in preventing such contamination. Indeed, the majority in United States v. 449 Cases, Containing Tomato Paste, *supra,* decided, in effect, that the failure of the Administrator to comply with the Administrative Procedure Act by publishing in advance the standards of permissible contamination was not a defense to the condemnation proceeding. Whatever remedy, if any, the producer has against the United States under these circumstances it does not lie in this proceeding.

Therefore, it is ordered that the 900 cases of canned peaches be condemned.

The above shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.