**SUPREME BEEF PROCESSORS, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.**

No. CIV.A. 3:99CV2713G.

United States District Court, N.D. Texas, Dallas Division.

May 25, 2000.

James Winford Bowen, Jenkins & Gilchrist, Dallas, TX, Robert G. Hibbert, McDermott, Will & Emery, Washington, DC, for plaintiff.

Eric D. Goulian, U.S. Dept. of Justice, Civil Div. Federal Programs Branch,

Thomas Millet, U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM ORDER

FISH, District Judge.

Before the court are the motions of both parties for summary judgment. For the reasons discussed below, the plaintiff's motion is granted and the defendant's motion is denied.

### I. BACKGROUND

On July 25, 1996, the Food Safety and Inspection Service (the "FSIS")—to whom the Secretary of Agriculture has delegated his authority to enforce several statutes—issued a final rule pursuant to the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 *et seq.* Memorandum in Support of Defendant's Motion for Summary Judgment ("Defendant's Brief") at 3, 5. Known as HAACP (Hazard Analysis and Critical Points), the rule requires all meat and poultry processors to develop and implement a system of preventive controls to ensure the safety of their products. *Id.* at 5. First, a meat processor must analyze its processing procedures and identify the critical points at which health hazards can be controlled.[1] *Id.* at 6. The plant must then (1) establish maximum and minimum limits for the temperature, humidity, pH, and chlorine levels of meat at those critical points; (2) monitor the levels of those measurements; and (3) take corrective action if their levels deviate from their limits. *Id.*

To evaluate the overall effectiveness of a meat processor's HAACP plan, the FSIS tests the level of *Salmonella* in a plant's finished product. *Id.* at 7. If the level of *Salmonella* in a processor's product does not remain below a certain point—dubbed a "performance standard" by the FSIS—its HAACP plan is considered ineffective. *Id.* In other words, the FSIS uses *Salmo-*

---

1. These points often include places in the process where meat is chilled, cooked, or · where internal organs are removed.

*nella* as an "indicator organism" that measures a HAACP plan's effectiveness against not just *Salmonella,* but all pathogens. *Id.* at 7–8. According to the FSIS, it chose *Salmonella* as its indicator organism because

> (1) it is the most common bacterial cause of food-borne illness; (2) FSIS baseline data showed that *Salmonella* colonizes in a variety of mammals and birds, and occurs at frequencies which permit changes to be detected and monitored; (3) current methodologies can recover *Salmonella* from a variety of meat and poultry products; and (4) intervention strategies aimed at reducing fecal contamination and other sources of *Salmonella* on raw product should be effective against other pathogens.

*Id.* at 8.

The FSIS has established a three-step procedure to test whether a processor's HAACP plan is meeting the performance standards. *Id.* at 9. First, the FSIS takes samples from a processor's finished product for 53 consecutive days. *Id.* If more than five of these 53 samples test positive for *Salmonella,* the plant is required to take immediate action to remedy its failure. *Id.* (citing 9 C.F.R. § 310.25(b)(1) [Table 2] ). The FSIS then conducts another round of tests. *Id.* at 9–10. If more than five of the second set of samples test positive for *Salmonella,* the plant must this time reassess its HAACP plan and "take appropriate corrective action." *Id.* at 10 (citing 9 C.F.R. § 310.25(b)(3)(ii)). A third round of tests is then administered. *Id.* Failure of this third series of tests

> constitutes failure to maintain sanitary conditions and failure to maintain an adequate HAACP plan ... for that product, and will cause FSIS to suspend inspection services. Such suspension will remain in effect until the establishment submits to the FSIS Administrator or his/her designee satisfactory written assurances detailing the action taken to correct the HACCP system and, as appropriate, other measures taken by the

establishment to reduce the prevalence of pathogens.

*Id.* (quoting 9 C.F.R. § 310.25(b)(3)(iii)).

In June of 1998, the plaintiff Supreme Beef—a processor/grinder—implemented a HAACP pathogen control plan, and on November 2nd of that year, the FSIS began its evaluation of that plan by testing the company's finished product for *Salmonella.* *Id.* After four weeks of testing, the FSIS notified Supreme Beef that it would likely fail the *Salmonella* tests. *Id.* Pursuant to the final test results—which found 47 percent of the samples taken from Supreme Beef contaminated with *Salmonella*—FSIS issued a Noncompliance Report, advising the processor that it had not met the performance standard. *Id.* at 10–11. Included in the report was the FSIS's warning to Supreme Beef to take "immediate action to meet the performance standards." *Id.* at 11. Supreme Beef responded to the FSIS's directive on March 5, 1999, summarizing the measures it had taken to meet the performance standard and requesting that the second round of testing be postponed until mid-April to afford the company sufficient time to evaluate its laboratory data. *Id.* The FSIS agreed to the request and began its second round of tests on April 12, 1999. *Id.*

On June 2, the FSIS again informed Supreme Beef that it would likely fail the *Salmonella* tests and, on July 20, issued another Noncompliance Report—this time informing the grinder that 20.8 percent of its samples had tested positive for *Salmonella.* *Id.* Supreme Beef appealed the Noncompliance Report, citing a disparity between the FSIS's results and the results of its own tests conducted on "companion parallel samples." *Id.* Those tests, Supreme Beef asserted, had revealed only four samples containing *Salmonella.* *Id.* at 11–12. The FSIS denied the appeal but, based on Supreme Beef's commitment to install 180 degree water source on all boning and trimming lines, granted the company's request to postpone the next round of *Salmonella* testing for 60 days.

*Id.* at 12. The agency later withdrew the extension, however, after learning that Supreme Beef was merely considering installation of the water source. *Id.*

The third set of tests began on August 27, 1999, and after only five weeks, the FSIS advised Supreme Beef that it would again fall short of the ground beef performance standard. *Id.* On October 19, the FSIS issued a Notice of Intended Enforcement Action, which notified Supreme Beef of the agency's intention to suspend inspection activities. *Id.* at 13. The Notice gave Supreme Beef until October 25, 1999 to demonstrate that its HAACP pathogen controls were adequate or to show that it had achieved regulatory compliance. *Id.* Although Supreme Beef promised to achieve the 7.5 percent performance standard in 180 days, it failed to provide any specific information explaining how it would accomplish that goal, and the FSIS decided to suspend inspection of Supreme Beef's plant. *Id.*

On the day the FSIS planned to withdraw its inspectors, Supreme Beef brought this suit against the FSIS's parent agency, the United States Department of Agriculture (the "USDA"), alleging that in creating the *Salmonella* tests, the FSIS had overstepped the authority given to it by the FMIA. Along with its complaint, Supreme Beef moved to temporarily restrain the FSIS from withdrawing its inspectors. This court granted Supreme Beef's motion and, after a subsequent hearing, also granted Supreme Beef's motion for a preliminary injunction. Both parties—Supreme Beef and the USDA—now assert cross-motions for summary judgment. Because this is apparently the first time that a meat processor has challenged the FSIS's performance standard rules, this case raises issues of first impression, not merely in this circuit but throughout the nation.

## II. *ANALYSIS*

### A. *Legal Standard*

Recently, the Supreme Court reiterated its holding that the relevant legal standard courts should apply when evaluating an administrative agency's construction of a statute is found in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See *Food and Drug Administration v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120, 120 S.Ct. 1291, 1300, 146 L.Ed.2d 121 (2000). Under *Chevron*, a court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. If so, the inquiry is over, and the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, however, Congress is silent or ambiguous with respect to the relevant issue, the court must determine whether the agency's regulation "is based on a permissible construction of the statute." *Id.* To determine whether Congress has specifically addressed an issue, this court should not limit itself to an examination of an isolated statutory provision; rather, "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Brown & Williamson*, 529 U.S. at ———, 120 S.Ct. at 1300–01 (citing *Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994)). Therefore, a court must interpret the statute "as a symmetrical and coherent regulatory scheme ... and fit, if possible, all parts into an harmonious whole...." *Id.* at 1301 (quoting *Gustafson v. Alloyd Company, Inc.*, 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and *FTC v. Mandel Brothers*, 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959)).

### B. *Framework of the FMIA*

Section 608 of the FMIA directs the Secretary of Agriculture to inspect slaughtering and packing establishments "as may be necessary to inform himself concerning the sanitary conditions of the

same ...." 21 U.S.C. § 608. Further, "where the sanitary conditions of any such establishment are such that the meat or meat food products are rendered adulterated, [the Secretary] shall refuse to allow said meat or meat food products to be labeled, marked, stamped, or tagged as 'inspected and passed.'" *Id.* In short, then, if the USDA finds a plant's meat to be adulterated, it cannot label that meat "inspected and passed."[2] A first reading of Section 608 raises an obvious question: when will meat be considered "adulterated?" Section 601(m) of the same title provides the answer to that question, listing several alternative definitions. Among these is the definition found in subsection section 601(m)(4), which provides that a meat product is adulterated

> if it has been prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.

§ 601(m)(4). Unlike the other definitions of "adulterated" found in § 601(m), subsection 601(m)(4) focuses on the conditions of a processor's plant and not on the condition of its meat. See *United States v. General Foods Corporation,* 446 F.Supp. 740, 752 (N.D.N.Y.) ("actual contamination of the finished product need not be shown") (citing *United States v. H.B. Gregory Company,* 502 F.2d 700 (7th Cir. 1974), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975)), *aff'd,* 591 F.2d 1332 (2d Cir.1978) (table); *United States v. 1200 Cans,* 339 F.Supp. 131, 142 (N.D.Ga.1972) (holding that an identical definition of the term "adulterated" under the Federal Food, Drug, and Cosmetic Act "is primarily aimed at the accompanying conditions and not the resultant production"). In other words, if the conditions of a plant are insanitary, all of the meat prepared, packed, or held in it will be

considered—under 601(m)(4)'s definition—adulterated.

To determine whether a plant is insanitary under § 601(m)(4), the USDA created the performance standards and *Salmonella* tests discussed above. According to the USDA, Supreme Beef failed the *Salmonella* tests on three occasions, causing its plant to be found insanitary. Based upon § 601(m)(4)'s mandate that all of the meat in an insanitary plant should be considered adulterated, the USDA concluded (1) that the meat in Supreme Beef's plant was adulterated and (2) that because section 608 of the FMIA prohibited it from labeling adulterated meat, future testing at the plant was futile until the Supreme Beef made significant changes in its pathogen controls. Accordingly, the USDA attempted to withdraw its inspectors until Supreme Beef notified it of any substantial changes made to its HAACP plan. That withdrawal was prevented only by this court's injunction.

Supreme Beef's complaint in this case is based on three principal grounds: (1) that the USDA's use of the *Salmonella* tests to evaluate the sanitation of processing plants is outside the authority granted to USDA by the FMIA; (2) that even if the USDA were acting within its authority in using the *Salmonella* tests, the FMIA does not authorize the removal of inspectors as a consequence of failing the tests; and (3) that even if the USDA could remove its inspectors, section 310.25(b)—as applied to Supreme Beef—violates the Due Process Clause of the Fifth Amendment because it fails to provide a pre-suspension hearing.

### C. *Can the USDA Use the Salmonella Tests to Evaluate the Sanitation of a Processing Plant?*

■ Because the USDA's performance standards and *Salmonella* tests do not necessarily evaluate the *conditions* of a meat processor's establishment, they cannot serve as the basis for finding a plant's

---

**2.** Such a refusal to label may be a death knell to a meat processor because federal law prohibits the sale or transport in interstate commerce of meat that has not been labeled "inspected and passed." *See* 21 U.S.C. § 610(c).

meat adulterated under § 601(m)(4). Under that statute, a processor's meat is considered adulterated only when the USDA finds the conditions of the processor's establishment to be insanitary. The USDA's *Salmonella* tests, however, inspect a processor's *end product* to determine whether its plant's *conditions* are sanitary. The flaw in such tests is that the presence of *Salmonella* is not solely—or even substantially—dependent upon the sanitation in a grinder's establishment. Indeed, a plant could, in theory, be completely sanitized from top to bottom, but if the meat in it tests positive for *Salmonella*, the USDA could withdraw its inspectors, effectively closing a plant that is sanitary. The USDA itself admits as much.[3]

But how could a sanitary plant produce meat yielding such poor *Salmonella* test results? The USDA inspector on duty at Supreme Beef prior to November 29, 1999 suggested one logical possibility. When asked for his professional judgment as to what might have caused the processor's test failures, the inspector replied: "*Salmonella* coming into the facility through *Salmonella* contaminated carcases which they purchase for further processing." Testimony of Lynn Huckins, quoted in Reply Brief in Support of Plaintiff's Motion for Summary Judgment at 12–13. And— as even the USDA and *amici curiae* admit—grinders have no means to remove *Salmonella* from meat. *See* Memorandum of Consumer Groups, *Amici Curiae,* in Opposition to Plaintiff's Motion for Summary Judgment at 9; Declaration of Dr. Kerri B. Harris, Exhibit A to Reply of Plaintiff Amici to the USDA's Motion for Summary Judgment ¶ 3. Thus, meat that comes into a plant already contaminated with *Salmonella* will test positive for that

organism after any processing, regardless of sanitary conditions in the plant where it is processed. This demonstrates the unreliability of using a processor's finished product to draw any conclusions about the sanitary conditions in its plant.

The USDA argues, however, that the inability of the *Salmonella* tests to determine whether meat became contaminated with *Salmonella* before or after it entered a processing plant is irrelevant because "[m]easures controlling articles entering a meat plant . . . are just as important to the sanitation of a plant as controls over the actual physical equipment inside the facility" and therefore should also be evaluated when testing the conditions of a processing plant. Defendant's Opposition to Plaintiff's Cross–Motion for Summary Judgment at Section I, A. While the court agrees that such controls are important, the issue here is not whether controls on meat entering a plant are important but whether the lack of such controls can be part of the evaluation, under § 601(m)(4), of sanitary conditions in the plant.

The court is of the opinion, for several reasons, that it cannot. First, the statute itself does not explicitly impose such a requirement and its plain language does not seem to support such a reading. Second, other portions of the FMIA address the conditions of meat at other stages of production. For example, meat at slaughtering plants must also be inspected and passed by the USDA before it may be sold to a grinder. Indeed, the Supreme Beef samples that failed the *Salmonella* tests had already been inspected and passed by the USDA at a separate slaughtering facility. USDA testing at these other stages

**3.** At the preliminary injunction hearing held in this case, FSIS Administrator Thomas J. Billy was asked:

> Q: So this plant could be spotless, most sanitary plant in the world, and if it fails the *Salmonella* performance standards, then it's automatically deemed to be insanitary, correct?
>
> A: Yes.

Testimony of Thomas J. Billy at Transcript of Hearing on Application for Preliminary Injunction Before the Honorable A. Joe Fish, attached to Appendix of Exhibits to Plaintiff's Motion for Summary Judgment at 113–14. In other words, the USDA itself admits that the *Salmonella* tests may have no relation to the sanitary conditions in a meat processor's establishment.

of meat processing would be unnecessary if grinders were required to reject meat contaminated with *Salmonella* coming into their plants. Lastly, no court applying § 601(m)(4) has ever found a plant insanitary unless physical conditions within the plant were unacceptable. See, *e.g.*, *General Foods*, 446 F.Supp. at 753 (finding no violation because presence of mold that naturally occurred in a product did not necessarily impugn the conditions of the plant itself); *1200 Cans*, 339 F.Supp. at 142 (finding plant insanitary based on—among other conditions—failure to wash and sanitize eggs prior to breaking). Therefore, viewing the FMIA as a whole, this court believes that Congress has addressed the issue of whether it is appropriate to judge sanitary conditions in a plant by looking only to samples of the plant's product, especially given the USDA's recognition that any contamination of such product quite possibly results from the condition of the meat entering the plant (already inspected and passed by the USDA) rather than sanitary conditions in the plant itself.

The USDA and *amici curiae* argue nevertheless that prohibiting the use of the performance standards and *Salmonella* tests to evaluate the sanitary condition of a plant is a rejection of the progress of science and would restrict the USDA to inspections using only the human senses. *See*, *e.g.*, Memorandum of Consumer Groups, *Amici Curiae*, in Opposition to Plaintiff's Motion for Summary Judgment at 7–8. This argument misses the point, for what the court takes issue with today is not the use of scientific methods in USDA inspections but the agency's science-based testing of a processor's *product* to evaluate the *conditions* of its plant. There is no reason to suppose that § 601(m)(4) would not allow science-based tests, as long as those tests truly evaluate sanitary conditions in a processing plant. And, science-

based tests of a plant's end product may be appropriate when the USDA is determining whether a plant's meat is adulterated under the several other definitions of "adulterated" provided by § 601(m).[4]

## III.  *CONCLUSION*

To recapitulate, the USDA attempted to withdraw its inspectors from Supreme Beef's plant for the processor's alleged violation of section 608 of the FMIA, which prohibits the USDA from approving adulterated meat for sale to the public. Supreme Beef's meat was found to be "adulterated" based upon that term's definition in subsection 601(m)(4) of the same Act. To find meat adulterated under § 601(m)(4), a processor's plant conditions must first be found to be insanitary. Because the *Salmonella* tests used by the USDA to evaluate Supreme Beef's plant did not necessarily measure the actual conditions of that plant, however, the agency—in effect—never found the conditions of Supreme Beef's plant insanitary and therefore had no basis for finding Supreme Beef's product adulterated under § 601(m)(4).

Administrative agencies such as the USDA are accorded substantial discretion in carrying out their rule-making and enforcement responsibilities, but that discretion is not unbounded. While *Chevron* teaches that this court cannot substitute its judgment for that of the USDA, "nothing in *Chevron* permits or implies support for the proposition than an administrator can call black white, nor that the courts are rendered impotent to prevent administrative mysticism." *Griffon v. United States Department of Health*, 802 F.2d 146, 155 (5th Cir.1986). In the context of this case, *Griffon* might be paraphrased to say that "*Chevron* does not allow the USDA to deem a sanitary plant insanitary."

4. For example, section 601(m)(1) deems meat adulterated "if it bears or contains any poisonous or deleterious substance which may render it injurious to health...." Surely, if

the USDA developed a science-based test for poisons, it could use such a test to determine whether a plant's meat was adulterated under that section.

As this court remarked in the preliminary injunction hearing, the issue in this case is not whether *Salmonella* and other pathogens in meat is desirable or acceptable. The issue, instead, is whether the USDA—in creating and attempting to enforce the performance standards and *Salmonella* tests at issue herein—was acting within the authority granted it by Congress. For the reasons discussed above, this court concludes that USDA's withdrawal of inspectors from Supreme Beef's production facility was not, in the circumstances presented here, an action authorized by law. Accordingly, Supreme Beef's motion for summary judgment is **GRANTED**, and the USDA's motion for summary judgment is **DENIED**.

Judgment will be entered for Supreme Beef. Within fifteen days of this date, counsel for Supreme Beef shall submit a proposed form of judgment in conformity with this memorandum order.

**SO ORDERED.**