United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 16, 2004**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 03–41345

_____

In The Matter Of :  SUPREME BEEF PROCESSORS, INC.

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEPHEN ZAYLER, Trustee of the Estate of Supreme Beef
Processors, Inc.,

Appellant,

versus

DEPARTMENT OF AGRICULTURE; UNITED STATES OF
AMERICA

Appellees.

_____

Appeal from the United States District Court
For the Eastern District of Texas

_____

Before BENAVIDES, STEWART, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Debtor meat processor brings counterclaim against the Department of Agriculture for a

number of alleged torts stemming from that agency's inspection regime at the debtor's plant.  The

agency argues that its sovereign immunity bars those counterclaims; the debtor contends that the

agency waived that right by filing a claim against the debtor's estate for unpaid overtime services. We hold that the debtor does not meet the statutory requirements for a compulsory counterclaim, and therefore do not reach the merits of their challenge to the agency's sovereign immunity. We also hold that the debtor is entitled to bring a permissive counterclaim as an offset to the agency's claim. Therefore, we affirm in part and reverse and remand as to the amount, if any, of the offset.

## I. FACTS AND PROCEEDINGS

The United States Department of Agriculture ("USDA") is responsible for ensuring the safety of the nation's meat products. *See* 21 U.S.C. § 608. The Secretary of the USDA ("Secretary") is required by statute to inspect the meat supply of the United States, and to bar the sale of such products that fail inspection. *Id.* The Secretary has delegated this responsibility to the Food Safety and Inspection Service ("FSIS"). USDA pays for the inspection services; however, it is authorized by statute to seek reimbursement for overtime work that is performed at any particular plant. *See* 21 U.S.C. § 695; 7 U.S.C. § 394. USDA also provides certification services for which it may collect fees pursuant to 7 U.S.C. § 1622(h).

In 1996, FSIS, after a notice and comment period, adopted regulations known as the Pathogen Reduction, Hazard Analysis and Critical Control Point Systems ("HACCP"). 61 Fed. Reg. 38,806–38,864 (July 25, 1996) (codified in scattered sections of 9 C.F.R.). In essence, HACCP requires meat and poultry producers to implement a program for maintaining a low level of pathogens in their products. In particular, producers must (1) identify, and establish a plan to eliminate, hazards at their plant; (2) monitor the level of each hazard at their plant; and (3) allow for USDA verification of their plan performance. FSIS proposed target levels of some common hazards, such as e. coli

2

bacteria and, relevant to this case, salmonella.[1] FSIS achieves verification of plan performance through a series of tests that determines the level of salmonella in a particular plant's finished meat products. Those companies that fail FSIS's verification will have their meat products barred from the market.

In June 1998, Supreme Beef Processors, Inc. ("Supreme Beef"), a company that processes, grinds, and sells meat products, implemented an HACCP regime. In November, FSIS began testing for salmonella at Supreme Beef's plant in order to verify the efficacy of Supreme Beef's hazard reduction plan. After four weeks of testing, FSIS informed Supreme Beef that it would likely fail the test, and that the company needed to take immediate action to meet the performance standards. In April 1999, after being notified by Supreme Beef that it had improved its inspection regime, FSIS initiated a second round of testing at the plant. This, too, Supreme Beef failed, as it did a third round of testing which began in August 1999.

As a result of Supreme Beef's continuing inability to meet the salmonella safety benchmark, FSIS issued a Notice of Intended Enforcement on October 19, 1999, under which it planned to suspend inspections at the plant starting on October 25. Without inspectors, Supreme Beef could not have its products stamped "INSPECTED and PASSED" and consequently could not legally sell its products in the market. *See* 21 U.S.C. § 621. USDA also canceled its contract with Supreme Beef for the provision of beef for the National School Lunch Program. In addition to the National School

---

[1] Salmonella was chosen because "it is the most common cause of foodborne illness associated with meat and poultry products." 61 Fed. Reg. 38,885 (July 25, 1996). The salmonella performance standard for raw beef is 7.5 percent.

Lunch contract, Supreme Beef lost "other actual and potential contracts" with wholesalers after USDA's decision to withdraw its inspectors.

On October 25, Supreme Beef moved to temporarily restrain USDA from removing the inspectors from its plant, contending that the salmonella HACCP was not within FSIS's statutory grant of power. The district court issued the TRO, and later determined that the FSIS testing regime was not sufficiently determinative of the sanitary conditions of the plant, and thus outside of FSIS's regulatory prerogative. *See Supreme Beef Processors, Inc. v. United States Dep't of Agric.*, 113 F. Supp. 2d 1048 (N.D. Tex 2000), *aff'd*, 275 F.3d 432 (5th Cir. 2001). Supreme Beef also moved the court to prevent USDA from enforcing the terms of the National School Lunch contract, which the court denied.

As a consequence of its pecuniary difficulties—Supreme Beef suffered a substantial decrease in revenue from the lost contracts with USDA and other buyers—the company filed for Chapter 11 Bankruptcy on September 25, 2000 (later converted to Chapter 7). Both USDA and FSIS filed claims against Supreme Beef's estate for just over $30,000 for overtime inspection services provided between April 9 and September 25, 2000. In December 2002, the district court granted Supreme Beef's motion to withdraw the case from the bankruptcy court pursuant to 28 U.S.C. § 157(d). On January 31, 2003, Supreme Beef filed counterclaims under the Federal Tort Claims Act ("FTCA") against USDA alleging, among other things, tortious interference and slander. USDA moved the court to dismiss the complaint based on Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Supreme Beef's claims were barred by USDA's sovereign immunity. The district court granted the motions. Supreme Beef timely appeals to this Court.

## II. STANDARD OF REVIEW

4

This Court reviews *de novo* a district court's dismissal pursuant to Rules 12(b)(1) and 12(b)(6). *See, e.g., Bombadier Aerospace Employee Welfare Benefits Plan v. Ferrer*, 354 F.3d 348, 351 (5th Cir. 2003). A dismissal on such grounds is proper only if it appears certain, taking all facts as true and resolving all inferences and doubts in plaintiff's favor, that plaintiff's claim would not entitle him to relief. *See Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).

### III. DISCUSSION

The United States government, including federal agencies such as USDA, is immune from suit unless that immunity is expressly waived by Congress. *See, e.g.*, *Hercules, Inc. v. United States*, 516 U.S. 417, 423–24 (1996); *Wilkerson v. United States*, 67 F.3d 112, 118 (5th Cir. 1995). Without a waiver, this Court does not have jurisdiction over an action against the United States, and must dismiss the complaint pursuant to Rule 12(b)(1). FED. R. CIV. P. 12(b)(1).

In its original complaint, Supreme Beef alleged various torts, including slander and libel. Jurisdiction for those claims was based on the FTCA, which provides the exclusive remedy for tort actions against the United States. *See* 28 U.S.C. § 2679. If Supreme Beef had met the appropriate statutory requirements, the FTCA would provide jurisdiction over its claims. In its response, however, USDA argues that the FTCA does not apply because the complaint was filed after the limitations period expired and before all statutorily-required administrative options were exhausted. On appeal, Supreme Beef implicitly concedes these defects of its complaint, but nevertheless asserts that this Court has jurisdiction because Title 11, Section 106 of the Bankruptcy Code provides a separate and independent waiver of USDA's sovereign immunity. There are two subsections, §§ 106(b) and (c), on which Supreme Beef relies. We discuss each in turn.

**A. Section 106(b) does not apply to Supreme Beef's counterclaim**

5

Supreme Beef argues that § 106(b) provides a separate and independent waiver of USDA's sovereign immunity. Section 106(b) states:

> A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

11 U.S.C. § 106(b). Therefore, under § 106(b) Supreme Beef's counterclaim must (1) arise out of the same transaction or occurrence of USDA's claim, and (2) be property of the estate.

Section 106(b) employs the same "transaction or occurrence" language that is found in Rule 13(a) of the Federal Rules of Civil Procedure for joinder of compulsory counterclaims. We use the same analysis here as we would in those cases to determine whether Supreme Beef's counterclaim is compulsory under § 106(b):

> (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim.

*Tank Insulation Int'l v. Insultherm, Inc.*, 104 F.3d 83, 85–86 (5th Cir. 1997). "If *any* of these four questions results in an affirmative answer, then the counterclaim is compulsory." *Id.*

Supreme Beef argues that there is a logical relationship between its counterclaims and USDA's original claim.[2] A logical relationship exists when either "'the same operative facts serve

---

[2] The other indicators under this analysis—substantially similar issues of facts and a res judicata relationship between claims—simply do not exist. Supreme Beef's claims for slander, tortious interference and business disparagement are not factually related to the inspection services. To the extent that Supreme Beef claims do rely on inspection services, they are limited to the salmonella inspections. Of the nearly 800 hours for which USDA seeks reimbursement, only 2 involve salmonella. Such a tenuous connection cannot establish that Supreme Beef's counterclaim is compulsory: there is neither a "substantial" factual overlap between claims, nor would the judgment of one claim have a res judicata effect on the other.

6

as the basis of both claims,'" or "'the aggregate core of facts upon which the claim rests activates additional rights, otherwise dormant, in the defendants.'" *Montgomery Elevator Co. v. Building Eng'g Serv. Co.*, 730 F.2d 377, 380 (5th Cir. 1984) (quoting *Plant v. Blazer Fin. Servs., Inc.*, 598 F.2d 1357, 1361 (5th Cir. 1979)). USDA and FSIS filed claims, totaling just over $30,000,[3] for inspection and certification services provided at Supreme Beef's plant between April and September 2000. To the extent that they relate to the inspections as such, Supreme Beef's counterclaims involve the three (failed) tests of Supreme Beef's plant. That testing occurred between June 1998 and November 1999. In contrast, only two of the hours for which USDA filed claims involved such testing; indeed, the overtime and certification services were performed over a different time period. Given these disparate factual predicates, the two claims simply do not bear a logical relationship to one another.

Supreme Beef places its principal reliance on *In re Lile*, 96 B.R. 81 (S.D. Tex. 1989). In that case, the debtor filed bankruptcy petitions on behalf of himself and his corporate restaurant. *Id.* at 82. After the IRS attempted to seize the restaurant's property on account of Lile's delinquent taxes, Lile counterclaimed against the IRS, arguing that the attempted levy violated the bankruptcy court's automatic stay order. *Id.* In determining that the IRS had waived its sovereign immunity, the *Lile* court held that the two claims—violation of the automatic stay, and the levy of the property for unpaid taxes—arose from the same transaction or occurrence because "[t]he [corporate] tax indebtedness began the chain of events which culminated in the attempted levy by the IRS which is the source of the claim against Lile." *Id.*

---

[3] FSIS's claim was for $13,906.06, and USDA filed a claim for $18,847.04.

7

Here, Supreme Beef argues that the salmonella testing triggered a "chain of events" that lead to both the withdrawal of USDA's inspectors and Supreme Beef's subsequent bankruptcy. It is true that, without a relationship between USDA and Supreme Beef, USDA's claims, and likely Supreme Beef's claims, would not have arisen. However, we find nothing in *Lile* to support Supreme Beef's contention that the two claims bear a logical relationship to each other. The "chain of events" language on which Supreme Beef relies is part of the court's unremarkable holding that one cannot separate the underlying debt (the unpaid taxes) from the enforcement action (the levy), when discussing whether the levy and the counterclaim arose from the same transaction or occurrence. Further, this Court has implicitly rejected this "chain of events" notion when common facts and legal issues are not present. *See Birmingham Fire Ins. Co. of Pa. v. Winegardner & Hammons, Inc.*, 714 F.2d 548, 551 (5th Cir. 1983) (holding that a suit against one insurance company was not compulsory as related to a suit against another insurance company because, *even though they were the result of the same event*—a hurricane strike—they were two different parties with two different policies).

We hold that Supreme Beef's counterclaim does not meet the statutory requirements as set forth in § 106(b) because it does not arise from the same transaction or occurrence as USDA's claim. By so holding, we need not reach the question of whether § 106(b) is a separate and independent waiver of the substantive and procedural requirements of the FTCA.

**B. Section 106(c) provides a setoff for Supreme Beef's permissive counterclaim**

Although § 106(b) does not provide relief, Supreme Beef argues that § 106(c) is a separate and independent waiver of USDA's sovereign immunity. Section 106(c) states:

> Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

8

11 U.S.C. § 106(c). In contrast with subsection (b), the plain text of subsection (c) does not require the counterclaim to arise from the same "transaction or occurrence" as the original claim. All that is required is that the claim "be property of the estate."

USDA makes two related arguments for why Supreme Beef's setoff should be barred. First, it argues that whether claims are pro perty of the estate turns on substantive law, in this case the FTCA. Second, it argues that the language of § 106(a)(5)—"[n]othing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title . . . or nonbankruptcy law"—precludes any holding that "creates" a claim for the debtor. Taken together, USDA contends that if Supreme Beef's claim did not exist outside of bankruptcy because it does not meet the FTCA's substantive requirements, then it cannot be brought as a counterclaim under § 106(c).

We reject USDA's argument. First, assuming, *arguendo*, that the underlying substantive law is the touchstone for a § 106(c) analysis, the FTCA's substantive requirements are not the only avenues for relief. Indeed, this Court has held that the federal government waives its immunity even to some recoupments that are not specifically authorized by statute. *See Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967) (holding that sovereign immunity may be waived as to a recoupment, noting that "the waiver can be by statutory consent to be sued *or by the institution of the particular action*") (emphasis added); *see also First Nat. Bank v. Genina Marine Serv., Inc.*, 136 F.3d 391, 395 n.8 (5th Cir. 1998) ("A recoupment claim within the scope of *Frederick* need not also fall within another statutory waiver of sovereign immunity) (citing *Frederick*, 386 F.2d at 488); *United States v. Johnson*, 853 F.2d 619, 621 (8th Cir. 1988) (holding that when the government

9

waives sovereign immunity as to matters in recoupment, "it does so even as to those claims that ordinarily are barred by the FTCA").

Second, and more important, accepting USDA's argument as it relates to sovereign immunity would render the plain language of § 106(c) meaningless. Determining whether a claim exists by looking to the statutory law that abrogates sovereign immunity is simply another way of saying that the setoff hinges on the existence of sovereign immunity. But § 106(c) plainly states that a party will be allowed a set off "notwithstanding any assertion of sovereign immunity." Similarly, reading § 106(a)(5) as precluding causes of action that are barred, outside of bankruptcy, by sovereign immunity would also be in direct conflict with the plain language of § 106(c). Because canons of statutory construction dictate that a court should "not render as meaningless the language of the statute," we reject USDA's interpretation of § 106(c). *Thompson v. Goetzmann*, 337 F.3d 489, 497 n.19 (5th Cir. 2003).

## IV. CONCLUSION

We AFFIRM the district court's ruling in regards to § 106(b). Because Supreme Beef is entitled to bring an offset against USDA for its claims under § 106(c), we REVERSE and REMAND to the district court to determine the amount, if any, of the offset.